IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| MELANIE RAHMANI, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | No. EP-13-CV-311-KC |
| | § | |
| WAL-MART STORES TEXAS, LLC, | § | |
| and ANNETTE QUITANILLA | § | |
| | § | |
| Defendants. | § | |

**<u>PLAINTIFF'S RESPONSE TO DEFENDANT WAL-MART'S OPPOSED MOTION TO STRIKE PLAINTIFF'S SUPPLEMENTAL DISCLOSURE OF EXPERT TESTIMONY, OR IN THE ALTERNATIVE, PLAINTIFF'S MOTION FOR LEAVE TO SUPPLEMENT PLAINTIFF'S RULE 26(A)(2) DISCLOSURE OF EXPERT TESTIMONY</u>**

## **STATEMENT OF ISSUES**

1. Whether Plaintiff's Supplemental Rule 26(a)(2) Disclosure of Expert Testimony should be struck as untimely?

**TO THE HONORABLE UNITED STATES DISTRICT COURT:**

## I. INTRODUCTION

1. On April 25, 2014, Plaintiff filed her Certificate of Service [Doc. 15] indicating that she had served upon Defendant Wal-Mart Plaintiff's Supplement Rule 26(a)(2) – Disclosure of Expert Testimony. Shortly after, Defendant Wal-Mart filed its Opposed Motion to Strike Plaintiff's Supplemental Disclosure of Expert Testimony [Doc. 17] on the alleged basis that such disclosure was untimely. For the following reasons, Defendant's motion to strike should be denied, or alternatively, Plaintiff asks this Court for leave to supplement such disclosure.

## II. FACTUAL BACKGROUND

2. This case involves claims for personal injury arising out of a slip and fall which occurred on or about August 6, 2012 on the premises of Defendant. Plaintiff filed her original petition for relief in County Court at Law No. 5 of El Paso County Texas on February 27th, 2013; however, on October 1st, 2013, Defendant filed its notice of removal and removed this case from state court. On December 19, 2013, the parties filed their Report of Parties' Planning Meeting [Doc. 4], which this Court then adopted pursuant to its Scheduling Order [Doc. 5]. Of special importance here, the Scheduling Order set forth a deadline for Plaintiff to designate experts by February 3rd, 2014. In observance of this deadline, Plaintiff's counsel designated all the non-retained treating experts of which his client had informed him and served such designations on Defendant on January 29th, 2014 [Doc. 8]. *See* Exh. A.

3. At the time of this designation, Plaintiff's medical treatment was ongoing and far from complete. Plaintiff had (and continues to have) ongoing issues with her knee, hip, and ankle. Further, Plaintiff is a Medicaid recipient, and as one familiar with Medicaid knows, the process of referrals, obtaining x-rays and MRIs, physical therapy, etc. is extended as it requires the

3

approval of Medicaid.   Thus, as of January 29th, 2014, much of Plaintiff's treatment was yet to happen.

    4.      On March 18, 2014, Defendant's counsel took the deposition of the Plaintiff Melanie Rahmani.   At that time, Plaintiff testified and disclosed for the first time new medical providers that she was now seeing or was going to be seeing:

> Q: In addition to emergency room treatment and West Texas Chiropractic, what other medical treatment did you seek for this accident?   What was the next doctor or provider that you went to see?
> A: Dr. Victor – here we go – S-O-N-G-B-A-N-D-I-T-H.   That's his entire last name.
> ...
> Q: Okay. How long after this accident did you – was when you first went to see Dr. Songbandith?
> A: I don't remember.
> Q: Can you give me an approximation?
> A: About a year.
> ...
> Q: Ms. Rahmani, I'm just going to ask you two questions to clarify something. You waited a year to see Dr. Songbandith.
> A: Dr. Victor.
> Q: Why did you wait a year?
> A: I didn't have any medical coverage and I was applying for Medicaid and when I finally got it, that's when I made the first appointment with him to see him.
> ...
> Q: Did Dr. Songbandith refer you to any type of physical therapy?
> A: He's referred me to an orthopedic.   He – Dr. Vu, it spelled V-U, and he's at their Montwood clinic.
> ...
> Q: So then after you saw Dr. Songbandith, he referred you to Dr. Vu.
> A: Yes.   Which I have my first appointment with him Thursday.
> **Q: So you have not been to see Dr. Vu yet.**
> **A: No.**   *See* Exh. B, Excerpts of Deposition of Melanie Rahmani at 37:25-38:05, 38:17-38:21, 54:22-55:04, 41:10-41:14, 41:20-41:25 [emphasis added].

Thus, on March 18, 2014, all counsel learned for the first time about Dr. Victor Songbandith (Northpark Medical Center) and Dr. Hong Q. Vu to whom Plaintiff was referred but had yet to see.

    5.      The parties then attempted to resolve this litigation, to no success, on April 17th,

4

2014 with Texas Arbitration and Mediation Services [Doc. 16]. Shortly thereafter on April 25th, 2014 Plaintiff supplemented her Rule 26(a)(2) disclosures [Doc. 15] to include the now previously known Dr. Songbandith (Northpark Medical Center) and Dr. Hong Q. Vu, in addition to Southwest X-Ray (MRI order by Dr. Songbandith on March 3, 2014), Border Therapy (at which Plaintiff has yet to receive *any* treatment because Medicaid has yet to improve), and Casa Medical (the provider of a knee brace recently prescribed by Dr. Vu). *See* Exh. C. On April 30th, 2014, Defendant filed it is motion to strike Plaintiff's supplemental designations [Doc. 17].

6. On May 7th, 2014, Plaintiff's counsel received notice that Plaintiff Rahmani is set to have surgery on her knee on May 21st, 2014 at Del Sol hospital with Dr. Vu, as a result of her fall. Trial in this case is set for October 31st, 2014 [Doc. 6]. As there will be forthcoming medical evidence in this case due to the ongoing treatment, Plaintiff does not oppose the extension of Defendant's expert designation deadline to rebut such evidence nor does she oppose an extension of the discovery deadline.

### III. ARGUMENT

7. Defendant's motion to strike Plaintiff's supplement disclosure of experts should be denied. Federal Rules of Civil Procedure 26(e)(1)(A) provides that:

> A party who has made a disclosure under Rule 26(a) – or who has responded to an interrogatory, request for production, or request for admission – must supplement or correct its disclosure or response in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, **and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing**. [emphasis added].

Pursuant to Rule 26(e)(1)(A), Plaintiff supplemented her Rule 26(a)(2) disclosures prior to the close of discovery and upon learning of new or potentially upcoming medical providers. In fact, other than Southwest X-Ray, the newly listed medical providers that have in fact already treated

5

Plaintiff have "otherwise been made known" to Defendant as of March 18, 2014 at the deposition of Plaintiff, nearly two months before the close of discovery. Thus any argument by Defendant that it has been prejudiced because the approaching discovery deadline is "just over two weeks away" is simply disingenuous. Further, Defendant's motion is nothing more than an attempt to "cut off" the medical treatment of Plaintiff, in hopes of not having to pay for the medical problems it has caused. The Federal Rules of Civil Procedure were not designed for such purposes. As Plaintiff was only acting in accordance with Rule 26(e)(1)(A), Defendant's motion should be denied.

8. Alternatively, and without waiving the foregoing, if this Court finds that Plaintiff's supplemental disclosure was untimely, Plaintiff hereby ask this Court for leave to file her supplemental disclosures, including any future supplementation related to her forthcoming surgery. As noted above, Plaintiff's supplemental disclosures all related to the continuing treatment that Plaintiff was receiving at or shortly after the time of the initial disclosures, in addition to forthcoming treatment. Moreover, leave to file such supplemental disclosures is extremely important to the presentation of Plaintiff's complete damages in this case. Defendant should not be awarded a benefit because Plaintiff continues to treat. Trial is still months away and the extension of the deadlines set forth in the Scheduling Order will do little to prejudice the parties in this case. Therefore, as there exists good cause in this case, Plaintiff ask this Court to grant Plaintiff leave to file her supplemental disclosures.

### IV. CONCLUSION

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff respectfully requests that the Court DENY Defendant Wal-Mart's Opposed Motion to Strike Plaintiff's Supplemental Disclosure of Expert Testimony, on in the Alternative, GRANT Plaintiff's Motion for Leave to

Supplement Plaintiff's Rule 26(A)(2) Disclosure of Expert Testimony and for such other and further relief, at law or in equity, to which Plaintiff may show herself justly entitled.

Respectfully submitted,

**SCHERR & LEGATE, PLLC**
Attorneys for Plaintiff
109 North Oregon, 12th Floor
El Paso, Texas   79901
Jtawney@scherrlegate.com
(915) 544-0100 (Voice)
(915) 532-1759 (Facsimile)


/s/ *James D Tawney*
**JAMES D. TAWNEY**
State Bar No.: 24060970

## CERTIFICATE OF SERVICE

I hereby certify that on May 12th, 2014, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record in this case.

/s/ *James D. Tawney*
**JAMES D. TAWNEY**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| MELANIE RAHMANI, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | EP-13-CV-311-KC |
| | § | |
| WALMART STORES TEXAS, LLC and | § | |
| ANNETTE QUINTANILLA, | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFF'S RULE 26(A)(2) - DISCLOSURE OF EXPERT TESTIMONY

TO THE HONORABLE JUDGE:

COMES NOW **MELANIE RAHMANI**, Plaintiff in the above entitled and numbered cause and files this her Rule 26(A)(2) – Disclosure of Expert Testimony:

The following Expert Witnesses have not been retained by Plaintiff. However, Plaintiff reserves the right to call these witnesses to testify at the time of trial, or to offer into evidence any of their previous testimony, statements, reports, or affidavits.

### NON-RETAINED EXPERTS

Willie Diaz, RT
Willy Enriquez, RTR
Armando R. Gutierrez, RN
Devin W. Hammer, RN
Susan D. Maldonado, Custodian of Medical Records
Shang J. Meng, PA
Jennifer Meza, Custodian of Billing Records
Sirous Partovi, MD
Nohemi Salas, RN
John N. Williams, MD
Physicians, nurses, employees, personnel, and custodian(s) of records of:
Las Palmas Medical Center
1801 N. Oregon
El Paso, Texas 79902
(915) 521-1200

1



Medical Provider. Will testify concerning Plaintiff's injuries, past and future medical bills, physical limitations, restrictions, loss of earning capacity, impairment, pain and suffering, and mental anguish.

Amy Bush, Custodian of Billing Records
Sirous Partovi, MD
Physicians, nurses, employees, personnel, and custodian(s) of records of:
Questcare Medical Services
2929 N. Central Expresway #300
Richardson, Texas 75080
(972) 758-3998
Medical Provider. Will testify concerning Plaintiff's injuries, past and future medical bills, physical limitations, restrictions, loss of earning capacity, impairment, pain and suffering, and mental anguish.

Tanya Biecker, Custodian of Records
John N. Williams, IV, MD
Physicians, nurses, employees, personnel, and custodian(s) of records of:
McKesson Corporation
c/o RadAdvantage, LLC
44000 Garfield Rd.
Clinton Twp., Michigan 48206
(586) 412-4000
Medical Provider. Will testify concerning Plaintiff's injuries, past and future medical bills, physical limitations, restrictions, loss of earning capacity, impairment, pain and suffering, and mental anguish.

Estella Acosta, Custodian of Medical Records
Silvia E. Marrufo, DC
Donna Yudico, Custodian of Billing Records
Physicians, nurses, employees, personnel, and custodian(s) of records of:
West Texas Chiropractic
4530 Montana Ave., Suite D
El Paso, Texas 79903
(915) 562-5700
Medical Provider. Will testify concerning Plaintiff's injuries, past and future medical bills, physical limitations, restrictions, loss of earning capacity, impairment, pain and suffering, and mental anguish.

And any other person or expert:

(a) who has been or will be named by any party in any answer to interrogatory.
(b) whose name appears on any document which has been or will be produced by any party in any response to request for production.

(c) whose name is reflected in any document which has been or will be obtained through the use of medical authorization.
(d) whose name is reflected in any document which has been or will be submitted to the Court by affidavit.
(e) whose name is reflected in any document which has been or will be subpoenaed by any party.
(f) whose name appears in the transcript of any deposition taken in this matter.
(g) whose name is reflected in any document which has been or will be attached to the transcript of any deposition.

The healthcare providers will testify that Plaintiff Melanie Rahmani has injuries to her left side of her body, part of her back, butt, hip, knee, foot, ankle, and other parts of her body. They will testify that Plaintiff has past and future impairment, pain, suffering, mental anguish, lost wage earning capacity, medical bills caused by the incident, that Plaintiff suffers limitations and restrictions at work, household services and every day life. They will testify regarding their treatment, conditions, prognosis, diagnoses, and may explain their findings and opinions, particularly with reference to the conditions and treatments in the past and future. The medical providers will testify based on facts gathered from medical records, medical charts, x-rays test results, patient histories, depositions and exhibits and/or a physical examination of the Plaintiff. In addition, they will testify as to their skills, years of education, years of formal training and on-the-job experience. Additionally, the medical care providers will discuss or identify the facts known to them regarding Plaintiff's condition, Plaintiff's accident, and how various conditions occurred. The information on the subject matter, facts known and opinions of the expert witnesses, to the extent that we know them, are set forth in their records and reports.

Respectfully submitted,

**SCHERR & LEGATE, PLLC**
Attorneys for Plaintiff
109 North Oregon, 12th Floor
El Paso, Texas 79901
jtawney@scherrlegate.com
(915) 544-0100 (Voice)
(915) 532-1759 (Facsimile)

**JAMES D. TAWNEY**
State Bar No. 24060970

3

## CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of January, 2014, a true and correct copy of the foregoing was delivered to:

Shannon J. Crenshaw
Mounce, Green, Myers,
Safi, Paxson & Galatzan
PO Box 1977
El Paso, Texas 79950-1977
(915) 532-2000

JAMES D. TAWNEY

ibW:\Rahmani-Melanie\FEDERAL\discovery\plaintiff\witness list\Witness List 12-31-2013 DRAFT.wpd

4

```
 1                UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF TEXAS
 2                      EL PASO DIVISION

 3
   MELANIE RAHMANI,          )
 4                           )
          Plaintiff,         )
 5                           )
   vs.                       ) Case No. EP-CV-311-KC
 6                           )
   WALMART STORES TEXAS,     )
 7 LLC and ANNETTE           )
   QUINTANILLA,              )
 8                           )
          Defendants.        )
 9

10

11

12       *******************************************
                    ORAL DEPOSITION OF
13                   MELANIE RAHMANI
                     March 18, 2014
14       *******************************************

15

16           ORAL DEPOSITION of MELANIE RAHMANI,

17 produced as a witness at the instance of the Defendant,

18 and duly sworn, was taken in the above-styled and

19 numbered cause on the 18th of March, 2014, from 11:25

20 a.m. to 12:45 p.m., before Caryn Miller, CSR in and for

21 the State of Texas, reported by machine shorthand, at

22 the offices of Sharon Cardon & Company, 109 North Oregon

23 Avenue, seventh floor, El Paso, Texas, pursuant to the

24 Texas Rules of Civil Procedure.

25
```

SHARON CARDON ... RT REPORTERS
109 North Oregon, ... s (915) 545-1410

PLAINTIFF'S EXHIBIT B

**Page 2**

```
 1              A P P E A R A N C E S
 2  For the Plaintiff:
 3      Mr. James Tawney, Esq.
        SCHERR & LEGATE, PLLC
 4      Attorneys at Law
        109 North Oregon, 12th Floor
 5      El Paso, Texas  79901
        jtawney@scherrlegate.com
 6
 7  For the Defendant:
 8      Ms. Shannon J. Crenshaw, Esq.
        MOUNCE, GREEN, MYERS, SAFI, PAXSON & GALATZAN
 9      Attorneys at Law
        100 North Stanton, 10th Floor
10      El Paso, Texas  79901
        crenshaw@mgmsg.com
11
12
13              I N D E X
14  Witness:                                  Page
15  MELANIE RAHMANI
16      Examination by Ms. Crenshaw           03
        Examination by Mr. Tawney             54
17      Further examination by Ms. Crenshaw   55
18
        Reporter's Certificate                58
19      Corrections and Signature             60
20
                E X H I B I T S
21                                         Marked
    18 - Copy of identification               03
22  17 - Customer statement (referenced)   (attached)
23
24
25
```

**Page 3**

```
 1              MELANIE RAHMANI,
 2  having been first duly sworn by the Certified Court
 3  Reporter, testified as follows:
 4              EXAMINATION
 5  BY MS. CRENSHAW:
 6      Q.  Good morning still, barely, Ms. Rahmani.  My
 7  name is Shannon Crenshaw and I'm one of the attorneys
 8  that represents Walmart in this matter.  Before we get
 9  started, I want to give you some instructions about the
10  rules for today's deposition.
11          Have you ever given a deposition before?
12      A.  No.
13      Q.  Okay.  I want you to understand -- and your
14  attorney may have explained most of this to you, but
15  just to reiterate -- your testimony today is sworn, you
16  are under oath and it's just the same as if you were
17  over at the courthouse in front of the judge and the
18  jury.  So I would like you to keep that in mind as
19  you're responding.
20          I am not reading from a script and so
21  sometimes my questions can sound a little jumbled or
22  they can be maybe not the best question.  So if you
23  don't understand the question, I'd like you to stop and
24  rephrase -- ask me to rephrase the question.  Is that
25  fair?
```

**Page 4**

```
 1      A.  Yes, ma'am.
 2      Q.  And if you do answer my question, I'm going to
 3  assume that you understood it.  Is that okay?
 4      A.  Yes, ma'am.
 5      Q.  And if at any time you need to take a break,
 6  need to use the restroom, get a snack or a drink, that's
 7  fine.  I don't envision we'll be here terribly long, but
 8  just ask if you need a break.
 9      A.  Okay.
10      Q.  There may be times during the deposition where
11  your attorney objects to my question.  And I want you to
12  know that you need to respond to the question if your
13  attorney objects, unless he specifically tells you,
14  "Please do not answer that question."
15      A.  Okay.
16      Q.  Okay.  Would you please state your full name.
17      A.  Melanie Ann Rahmani.
18      Q.  And you have already handed the court reporter
19  a copy of -- or I'm sorry.  You already handed the court
20  reporter your driver's license.
21      A.  ID.
22      Q.  Oh, identification?
23      A.  Yes, ma'am.
24      Q.  And she's made a copy of that which is going to
25  be Exhibit 18.
```

**Page 5**

```
 1      A.  Yes, ma'am.
 2          (Exhibit 18 marked.)
 3      Q.  (BY MS. CRENSHAW)  Do you have a driver's
 4  license?
 5      A.  I don't know.  And that's -- should I explain
 6  my answer?
 7      Q.  Yes.
 8      A.  I had a driver's license.  I got a speeding
 9  ticket and I didn't pay them so I don't know if it's
10  been suspended or not.  I haven't checked that.
11      Q.  Okay.  But at one point you did have a driver's
12  license.
13      A.  Yes, ma'am, under the same name.
14      Q.  And have you ever had any driver's licenses or
15  identification cards in any other state?
16      A.  No, ma'am.
17      Q.  And what is your date of birth?
18      A.  03/24/1978.  I turned 36.  God, I'm old.
19      Q.  And where do you currently live?
20      A.  2500 Morehead, M-O-R-E-H-E-A-D -- I don't know
21  if it's a drive or a street.
22      Q.  That's fine.
23      A.  Apartment 17, El Paso, Texas 79930.
24      Q.  Okay.  And who lives with you at 2500 Morehead
25  in apartment 17?
```

                                                                    34
1    A.  Psychiatrist.
2    Q.  And so you wouldn't consider him your general
3  doctor or your family doctor?
4    A.  No.  He worked with what used to be called
5  MHMR.  And now they're called EHN, Emergence Health
6  Network.
7    Q.  After you were home from the emergency room the
8  day that you went to Las Palmas emergency, when was the
9  next time that you saw a doctor for your injuries in
10 this accident?
11   A.  Within a week I went to West Texas
12 Chiropractic.
13   Q.  Who referred you to West Texas Chiropractic?
14          MR. TAWNEY:  Don't answer that question.
15          Objection to form.
16          MS. CRENSHAW:  What's the basis of your
17 objection?
18          MR. TAWNEY:  Privilege.
19   Q.  (BY MS. CRENSHAW)  When you went to West Texas
20 Chiropractic, what chiropractor did you see there?
21   A.  It's a lady.  I don't remember her name.
22   Q.  And how often were you going?
23   A.  I went three or four times because I was having
24 a really hard time getting somebody to watch my babies,
25 and it's not easy to have them there when you're getting

                                                                    35
1  chiropractic treatment because I'm usually -- you know,
2  you're hooked up to machines and stuff and I can't, you
3  know, take care of them and do that.
4    Q.  So you only went to West Texas Chiropractic
5  three or four times?
6    A.  After the initial assessment, yes.  And --
7    Q.  And you -- you mentioned earlier that you used
8  to work for a chiropractor.
9    A.  Uh-huh.
10   Q.  And so you understand that a chiropractor is
11 not a doctor.
12   A.  Yes.
13   Q.  And that a chiropractor doesn't go to medical
14 school.
15   A.  Some of them do.  Some of them will advance --
16 will want to advance their knowledge and they actually
17 do go to medical school.  Some actually do.
18   Q.  Understood.  To be a licensed chiropractor in
19 the state of Texas, you don't have to go to medical
20 school.
21   A.  I understand that, yes.
22   Q.  And you understand that a chiropractor doesn't
23 have to have a bachelor's degree.
24   A.  Yes.
25   Q.  And you understand that a chiropractor can't

                                                                    36
1  prescribe any type of medicine.
2    A.  Yes.
3    Q.  Or give you a shot like a nurse at Walgreens.
4    A.  Yes.  But as I said I worked for one and I do
5  know that if the -- if the chiropractor gives -- is --
6  if the treatment is good, I know it can help.
7    Q.  Understood.  What did they do for you at West
8  Texas Chiropractic?
9    A.  They put me on the intersegmental traction,
10 which is like a table that you lay on and it has like
11 rollers that go like this inside.  Actually feels like
12 kind of like a massage, but it's to help, you know, kind
13 of adjust your spine the way it should be and it's
14 traction.
15   Q.  Did the chiropractor perform manipulations on
16 you?
17   A.  No.  I could not actually do all of her
18 assessment because I could not -- I had no range of
19 motion on my left side.  I could not stand on my right
20 foot and raise my left leg up or anything like that.
21 It -- I couldn't put my leg out to the side like that.
22 I couldn't turn my ankle like this or like that.  I -- I
23 really had a hard time doing the assessment.
24   Q.  Understood.  Other than the intersegmental
25 traction, what other treatment did they give you at the

                                                                    37
1  chiropractor?
2    A.  Interferential stimulation, it's electrodes and
3  they put that around my knee.
4    Q.  Did that make you feel better?
5    A.  I want to say if they had done a better job of
6  it, probably it would have.  At the time --
7            MS. CRENSHAW:  Objection, nonresponsive.
8    Q.  (BY MS. CRENSHAW)  Did the treatment that they
9  give you there make you feel better?
10   A.  No.
11   Q.  Did they give you any other treatment other
12 than the intersegmental traction and the interferential
13 stimulation?
14   A.  They gave me ultrasound therapy and --
15   Q.  Did that make you feel better?
16   A.  No.
17   Q.  Okay.  What else?
18   A.  A massage.
19   Q.  And did that make you feel better?
20   A.  It helped my low back a little.  All it did is
21 kind of basically take off the edge of the -- of the
22 pain.  It doesn't relieve it, it just --
23   Q.  Understood.
24   A.  -- sort of makes it dealable [sic].
25   Q.  In addition to the emergency room treatment and

38

1 West Texas Chiropractic, what other medical treatment
2 did you seek for this accident? What was the next
3 doctor or provider that you went to see?
4    A. Dr. Victor -- here we go --
5 S-O-N-G-B-A-N-D-I-T-H. That's his entire last name.
6    Q. Songbandith. What kind of doctor is
7 Dr. Songbandith?
8    A. Internal medicine, family practice, something
9 like that.
10   Q. And how did you find Dr. Songbandith?
11   A. My daughter hurt her toe when we were going to
12 Carl's Jr. and their clinic, the North Park Clinic, is
13 right there and I rushed her -- I rushed her over there.
14 They took care of her. They were real nice and
15 everything and I just kind of switched everybody. You
16 know, I --
17   Q. Okay. How long after this accident did you --
18 was when you first went to see Dr. Songbandith?
19   A. I don't remember.
20   Q. Can you give me an approximation?
21   A. About a year.
22   Q. So it wasn't until a year after this accident
23 that you first went to see Dr. Songbandith.
24   A. (Indicating.)
25   Q. During that year of treatment -- I mean during

39

1 that year between this accident and when you went to see
2 Dr. Songbandith, did you continue to take the Vicodin
3 and the ibuprofen that was prescribed to you by the
4 emergency room doctor?
5    A. Once I finished that medication, all I could do
6 was take ibuprofen over the counter.
7    Q. Okay. So you did not refill those
8 prescriptions or they were not refilled for you.
9    A. I couldn't. No.
10   Q. Okay. So approximately a year after this
11 accident, you went to see Dr. Victor Songbandith.
12   A. Yes.
13   Q. What did you complain of when you went to see
14 Dr. Songbandith?
15   A. My left knee, my left ankle, my left hip and my
16 left low lumbar region of my back.
17   Q. And what did Dr. Songbandith do for you?
18   A. At that point he ordered an MRI. He gave me
19 some ibuprofen and some tramadol, but I had to stop the
20 tramadol.
21   Q. Why did you have to stop the tramadol?
22   A. The side effects of it.
23   Q. What side effects were you experiencing?
24   A. The jitters. It would make me real sleepy,
25 stuff like that.

40

1    Q. Did you have the MRI done that he ordered?
2    A. Yes.
3    Q. And what were the results of the MRI?
4    A. I have a torn cruciate ligament, a torn medial
5 meniscus and a torn ACL. I have fluid in my left knee
6 and there is inflammation enough to -- you know, it's
7 all visible on the MRI.
8    Q. Okay. Those are the problems in your knee.
9 What about your hip?
10   A. That they're not -- the hip and the ankle they
11 have put on hold right now. They're only dealing with
12 the knee.
13   Q. Okay.
14   A. Because as far as stability goes, when you're
15 talking about your lower extremities, your knee is your
16 stability, not your hip, not your ankle.
17   Q. Okay. So he prescribed ibuprofen and tramadol.
18 You were taking the ibuprofen, but you stopped taking
19 the tramadol.
20   A. (Indicating.)
21   Q. Did he prescribe any other medications?
22   A. Yes, he did. He started prescribing me
23 hydrocodone, which I take. In fact I brought with me
24 because I have to take it.
25   Q. What dosage of hydrocodone are you taking?

41

1    A. It says 325 milligrams, slash, 5 milligrams.
2 And it's one tablet every eight hours as needed for
3 pain.
4    Q. Thank you. In addition to the hydrocodone and
5 tramadol and the ibuprofen, did Dr. Songbandith
6 prescribe you any other medications for your injuries in
7 this accident?
8    A. No. I've just been taking the hydrocodone for
9 four months now.
10   Q. Did Dr. Songbandith refer you to any type of
11 physical therapy?
12   A. He's referred me to an orthopedic. He --
13 Dr. Vu, is spelled V-U, and he's at their Montwood
14 clinic.
15   Q. Okay. Are you still under the treatment of
16 Dr. Songbandith?
17   A. Yes.
18   Q. And you've --
19   A. He's my primary care.
20   Q. He's your primary care. So then after you saw
21 Dr. Songbandith, he referred you to Dr. Vu.
22   A. Yes. Which I have my first appointment with
23 him on Thursday.
24   Q. So you have not been to see Dr. Vu yet.
25   A. No.

**Page 54**

1  happen from now on. I just am putting my hands in the
2  care of these doctors that, you know, I never planned on
3  having to do before.
4      Q.  Thank you for taking the time. I hope that I
5  didn't take too much time and I understand that you need
6  to get back with your children.
7          Have I been kind and polite to you today?
8      A.  Yes.
9      Q.  And have you understood all my questions?
10     A.  Yes.
11     Q.  And if you didn't understand my question, you
12 stopped and asked me to rephrase or to change my
13 question so that you could understand it?
14     A.  Yes.
15     Q.  So all the questions you have answered, you
16 have understood and you understand what your answer was.
17     A.  Yes.
18     Q.  Okay.
19         MS. CRENSHAW:  Pass the witness.
20              EXAMINATION
21 BY MR. TAWNEY:
22     Q.  Ms. Rahmani, I'm just going to ask you two
23 questions to clarify something. You waited a year to
24 see Dr. Songbandith.
25     A.  Dr. Victor.

**Page 55**

1      Q.  Why did you wait a year?
2      A.  I didn't have any medical coverage and I was
3  applying for Medicaid and when I finally got it, that's
4  when I made the first appointment with him to see him.
5      Q.  At the time of the incident in August of 2012,
6  when you fell, how many pallets were in the area when
7  you fell?
8      A.  One. There was one pallet. Like the pallet
9  that I walked around was right here and in a few feet
10 away, which you can sort of see in the pictures, there
11 was a display thingy right there. But there was not
12 another pallet here.
13     Q.  All right.
14         MR. TAWNEY:  I'll reserve the rest of our
15 questions for trial. Pass the witness.
16         MS. CRENSHAW:  Just one follow-up question.
17              FURTHER EXAMINATION
18 BY MS. CRENSHAW:
19     Q.  I'm going to show you a picture that we
20 previously had out in Mr. Marquez's deposition. Is
21 this the -- the pallet that appears in the picture, is
22 this the only pallet that you ever saw?
23     A.  Yes.
24     Q.  And this shopping cart that appears in the
25 picture --

**Page 56**

1      A.  That was brought over by Ms. Baker, I believe,
2  because this is already after I fell, they had already
3  started cleaning it.
4      Q.  Did you have a shopping cart?
5      A.  Yes.  She brought it over.
6      Q.  So this was the shopping cart that you were
7  using?
8      A.  I'm not sure if that was mine or hers. I
9  believe that might have been hers because I think I had
10 more in mine than she did.
11     Q.  Okay. And do you feel that these tracks coming
12 from this spill could have come from your shopping cart?
13     A.  No. I did not have my cart with me. That had
14 to be from their equipment.
15         MR. TAWNEY:  Objection, form.
16     A.  The shopping cart, if you look at the wheels,
17 they're not even wide enough to make those mark.
18     Q.  (BY MS. CRENSHAW)  Did you have your shopping
19 cart with you when you fell?
20     A.  No.
21     Q.  So you were not pushing the cart with you.
22     A.  No.
23     Q.  You were just walking along.
24     A.  Yes, ma'am.
25     Q.  The shopping cart was in the aisle.

**Page 57**

1      A.  Was back by the sodas where Patricia was.
2      Q.  Okay.
3      A.  Because I was only going to go grab a few cans
4  of formula and I was going to carry them back to the
5  cart. I didn't see a need to push the cart all the way
6  up there.
7      Q.  Understood.
8          MS. CRENSHAW:  Pass the witness.
9          MR. TAWNEY:  We'll reserve our questions
10 for trial. Thank you.
11         (Deposition concluded, 12:45 p.m.)

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| MELANIE RAHMANI, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | EP-13-CV-311-KC |
| | § | |
| WALMART STORES TEXAS, LLC and | § | |
| ANNETTE QUINTANILLA, | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFF'S SUPPLEMENTAL RULE 26(A)(2)-DISCLOSURE OF EXPERT TESTIMONY

TO THE HONORABLE JUDGE:

COMES NOW **MELANIE RAHMANI**, Plaintiff in the above entitled and numbered cause and files this her Supplemental Rule 26(A)(2) – Disclosure of Expert Testimony:

The following Expert Witnesses have not been retained by Plaintiff. However, Plaintiff reserves the right to call these witnesses to testify at the time of trial, or to offer into evidence any of their previous testimony, statements, reports, or affidavits.

### NON-RETAINED EXPERTS

Willie Diaz, RT
Willy Enriquez, RTR
Armando R. Gutierrez, RN
Devin W. Hammer, RN
Susan D. Maldonado, Custodian of Medical Records
Shang J. Meng, PA
Jennifer Meza, Custodian of Billing Records
Sirous Partovi, MD
Nohemi Salas, RN
John N. Williams, MD
Physicians, nurses, employees, personnel, and custodian(s) of records of:
Las Palmas Medical Center
1801 N. Oregon
El Paso, Texas 79902
(915) 521-1200
Medical Provider. Will testify concerning Plaintiff's injuries, past and future medical bills, physical limitations, restrictions, loss of earning capacity, impairment, pain and suffering, and mental anguish.



1

Amy Bush, Custodian of Billing Records
Sirous Partovi, MD
Physicians, nurses, employees, personnel, and custodian(s) of records of:
Questcare Medical Services
2929 N. Central Expresway #300
Richardson, Texas 75080
(972) 758-3998
Medical Provider. Will testify concerning Plaintiff's injuries, past and future medical bills, physical limitations, restrictions, loss of earning capacity, impairment, pain and suffering, and mental anguish.

Tanya Biecker, Custodian of Records
John N. Williams, IV, MD
Physicians, nurses, employees, personnel, and custodian(s) of records of:
McKesson Corporation
c/o RadAdvantage, LLC
44000 Garfield Rd.
Clinton Twp., Michigan 48206
(586) 412-4000
Medical Provider. Will testify concerning Plaintiff's injuries, past and future medical bills, physical limitations, restrictions, loss of earning capacity, impairment, pain and suffering, and mental anguish.

Estella Acosta, Custodian of Medical Records
Silvia E. Marrufo, DC
Donna Yudico, Custodian of Billing Records
Physicians, nurses, employees, personnel, and custodian(s) of records of:
West Texas Chiropractic
4530 Montana Ave., Suite D
El Paso, Texas 79903
(915) 562-5700
Medical Provider. Will testify concerning Plaintiff's injuries, past and future medical bills, physical limitations, restrictions, loss of earning capacity, impairment, pain and suffering, and mental anguish.

Physicians, nurses, employees, personnel, and custodian(s) of records of:
Northpark Medical Center
9311 Diana
El Paso, Texas 79924
(915) 751-2448
Medical Provider. Will testify concerning Plaintiff's injuries, past and future medical bills, physical limitations, restrictions, loss of earning capacity, impairment, pain and suffering, and mental anguish.

Physicians, nurses, employees, personnel, and custodian(s) of records of:
Southwest X-Ray
PO Box 220122
El Paso, Texas 79913
(915) 544-7300
Medical Provider. Will testify concerning Plaintiff's injuries, past and future medical bills, physical limitations, restrictions, loss of earning capacity, impairment, pain and suffering, and mental anguish.

Physicians, nurses, employees, personnel, and custodian(s) of records of:
Hung Q. Vu, MD
10201 Gateway Blvd. W, Suite 201
El Paso, Texas 79925
(915) 691-6705
Medical Provider. Will testify concerning Plaintiff's injuries, past and future medical bills, physical limitations, restrictions, loss of earning capacity, impairment, pain and suffering, and mental anguish.

Physicians, nurses, employees, personnel, and custodian(s) of records of:
Border Therapy
2280 Trawood
El Paso, Texas 79935
(915) 595-3535
Medical Provider. Will testify concerning Plaintiff's injuries, past and future medical bills, physical limitations, restrictions, loss of earning capacity, impairment, pain and suffering, and mental anguish.

Physicians, nurses, employees, personnel, and custodian(s) of records of:
Casa Medical
7500 N. Mesa St. #217
El Paso, Texas 79912
(915) 833-2272
Medical Provider. Will testify concerning Plaintiff's injuries, past and future medical bills, physical limitations, restrictions, loss of earning capacity, impairment, pain and suffering, and mental anguish.

And any other person or expert:

(a) who has been or will be named by any party in any answer to interrogatory.
(b) whose name appears on any document which has been or will be produced by any party in any response to request for production.
(c) whose name is reflected in any document which has been or will be obtained through the use of medical authorization.
(d) whose name is reflected in any document which has been or will be submitted to the Court by affidavit.
(e) whose name is reflected in any document which has been or will be subpoenaed by any party.
(f) whose name appears in the transcript of any deposition taken in this matter.
(g) whose name is reflected in any document which has been or will be attached to the transcript of any deposition.

The healthcare providers will testify that Plaintiff Melanie Rahmani has injuries to her left side of her body, part of her back, butt, hip, knee, foot, ankle, and other parts of her body. They will testify that Plaintiff has past and future impairment, pain, suffering, mental anguish, lost wage earning capacity, medical bills caused by the incident, that Plaintiff suffers limitations and restrictions at work, household services and every day life. They will testify regarding their treatment, conditions, prognosis, diagnoses, and may explain their findings and opinions, particularly with reference to the conditions and treatments in the past and future. The medical providers will testify based on facts gathered from medical records, medical charts, x-rays test results, patient histories, depositions and exhibits and/or a physical examination of the Plaintiff. In addition, they will testify as to their skills, years of education, years of formal training and on-the-job experience. Additionally, the medical care

providers will discuss or identify the facts known to them regarding Plaintiff's condition, Plaintiff's accident, and how various conditions occurred. The information on the subject matter, facts known and opinions of the expert witnesses, to the extent that we know them, are set forth in their records and reports.

Respectfully submitted,

**SCHERR & LEGATE, PLLC**
Attorneys for Plaintiff
109 North Oregon, 12th Floor
El Paso, Texas 79901
jtawney@scherrlegate.com
(915) 544-0100 (Voice)
(915) 532-1759 (Facsimile)

JAMES D. TAWNEY
State Bar No. 24060970

**CERTIFICATE OF SERVICE**

I hereby certify that on this 25 day of April, 2014, a true and correct copy of the foregoing was delivered to:

Shannon J. Crenshaw
Mounce, Green, Myers,
Safi, Paxson & Galatzan
PO Box 1977
El Paso, Texas 79950-1977
(915) 532-2000
crenshaw@mgmsg.com

JAMES D. TAWNEY

ibW:\Rahmani-Melanie\FEDERAL\discovery\plaintiff\witness list\2nd Designation of Expert Witnesses 04-23-2014.docx

4